Nathan M. Smith, (023471)
nms@attorneys-arizona.com
Ariano & Reppucci, PLLC
1430 E. Missouri Avenue, Suite B127
Phoenix, Arizona 85014
Telephone:  (602) 615-0841
Facsimile:  (602) 489-7403

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| John W. Spelts, II, an individual,<br><br>        Plaintiff,<br><br>        vs.<br><br>Apartment Management Consultants, L.L.C.,<br>Defendant | No. _____<br><br>**COMPLAINT**<br>(Jury Trial Demanded) |

Plaintiff John W. Spelts, II, through his attorney, alleges as follows:

### SUMMARY OF THE COMPLAINT

1.      John W. Spelts, II, age forty-three, worked for nine years for Apartment

Management Consultants doing maintenance work on apartment complexes throughout

the Phoenix area.  Although he was titled a "project manager," and paid a salary, he

supervised no employees, had no hiring or firing authority, and spent over 75% of his

time doing physical labor – fixing air conditioners, plumbing, changing ceiling fans, renovating and cleaning apartments and installing doors and kitchen and bathroom appliances.   Apartment Management Consultants paid him a salary, demanded he work no less than 50 hours per week, asked him to keep false time records, and never paid him overtime.

2.    After nine years of working 50 plus hour weeks doing apartment maintenance and two heart attacks directly related to his work, Mr. Spelts was no longer useful to Apartment Management Consultants because he could no longer perform the physical labor required of the job.   Thus, Apartment Management Consultants claimed to "dissolve" Mr. Spelts' position "company-wide", even though he was the only person in Arizona with that position.   After "dissolving" his job, Apartment Management Consultants offered Mr. Spelts a lower paid position that they knew he could not perform with his health restrictions – functionally terminating him.   Mr. Spelts brings this lawsuit to recover wages due to him because he was improperly paid a salary and treated as "exempt" from overtime requirements and because he was terminated because he asserted his rights to FMLA leave and work restrictions.

**JURISDICTION AND VENUE**

3.    Jurisdiction in this Court is authorized by 28 U.S.C. § 1331.  The Court has jurisdiction because the counts alleged arise out of two federal statutes:  the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*

4.     This Court is a proper venue for this action because the alleged conduct at issue that gives rise to the Complaint occurred in the State of Arizona, Maricopa County.  28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

## THE EMPLOYERS

5.     Plaintiff is informed and believes and therefore alleges that Defendant Apartment Management Consultants L.L.C. is a Utah Limited Liability Corporation registered and doing business in Arizona.

6.     Greg B. Wiseman is the President of Apartment Management Consultants.  Mr. Spelts is informed and believes that Mr. Wiseman owns property in Arizona but resides in Utah.  Mr. Wiseman, as President of Apartment Management Consultants L.L.C., acted as Mr. Spelts' employer at all material times.

7.     Plaintiff is informed and believes and therefore alleges that Apartment Management Consultants L.L.C.  ("AMC") employs at least fifty employees within a seventy-five mile radius of the location where Mr. Spelts worked, at least 200 employees in Arizona, and at least 600 employees in the United States.

8.     AMC'S website, AMCLLC.net, describes AMC as a "full service property/asset management company" that "focuses on the need to serve [our] owners, employees, residents and vendors."  AMC's mission statement begins with the commitment "to identify the potential and maximize the earnings of our client's real estate investment."

9.     According to the website, AMC owns over 30 apartment rental properties in Arizona.  AMC reports that for 2013 its Arizona same store sales net operating income

increased 5.53%.  AMC reported that for 2014 its Arizona same store sales net operating income increased 9.08%.  For 2015, Arizona same store sales net operating income increased 13.12%.

10.   Acacia Capital Corp. is California Corporation registered to do business in Arizona. Acacia Capital Corp. manages funds that own sixteen of the properties  AMC manages in the Phoenix.  Mr. Spelts is informed and believes and thereon alleges that Acacia Capital Corporation's Executive Vice President Janet Bray is responsible for managing Acacia's ownership of the sixteen properties.

11.   Acacia Capital Corp. and Janet Bray directed and controlled Mr. Spelts' employment such that they both were employers of Mr. Spelts under the Fair Labor Standards Act during all material times.

## MR. SPELTS BEGAN WORKING FOR AMC AS A "MAINTENANCE SUPERVISOR."

12.   Plaintiff began his employment with Defendant in mid-February 2007.  Plaintiff was given the title of  "Maintenance Supervisor."  At the time he was hired as a Maintenance Supervisor, he was told he was a salaried employee.  His salary was to be calculated by multiplying an hourly rate of pay by 80 hours.  At the time he was hired, he was told that, as a salaried employee, he was expected to work no less than 50 hours per week, every week.

13.   Mr. Spelts started for a rate of pay of $16 per hour.  After a series of promotions and raises, by 2010 Mr. Spelts was being paid $32.00 per hour as the Maintenance

Supervisor for a large property owned by AMC's good customer, Acacia Capital Corporation.

14.    During his time at AMC, Plaintiff's salary would be reduced for any unexcused absence, such as an unearned sick day.  Even partial day absences – such as two hours for a doctor's appointment – were taken out of Plaintiff's salary at the hourly rate.

15.    Mr. Spelts was never paid overtime for his work as a Maintenance Supervisor.

16.    As a Maintenance Supervisor, Mr. Spelts  was put in charge of maintenance for specific apartment complexes.  "Supervising" meant cleaning out and repairing apartments after move-outs for rental.  "Supervising" meant responding to tenant work orders for plumbing repair, heating and air conditioning repair, carpentry and generally fixing anything that could go wrong with apartment buildings managed by AMC.   Mr. Spelts spent over 75% of his working hours performing these tasks.

### MR. SPELTS IS PROMOTED TO "PROJECT MANAGER"

17.    In early 2010 Mr. Spelts was promoted to Project Manger.  His pay varied between $29.00 per hour and 33.00 per hour, but stabilized at $32.87 for the past three years.

18.    AMC never provided him with a job description for the title of Project Manager.

19.    AMC continued to require that Mr. Spelts work at least 50 hours per week as he had as a Maintenance Supervisor.  Again, Mr. Spelts was not told to record his hours and did not do so.   Mr. Spelts was required to send weekly email updates describing the work he performed.

20.    Although his paystubs show hours allocated to various AMC properties that he worked on, those allocations do not reflect the actual time spent on any location during

any one week.   Mr. Spelts was never asked to adjust or approve the accuracy of these hourly allocations.

21.   Recently, AMC moved to a system where Mr. Bradley would tell Mr. Spelts how many hours to allot to each property for a two-week period on a time sheet.   The sheet had room for eight hours of work – 8 a.m. to 12 p.m. and 1 p.m. to 5 p.m.   Mr. Spelts was not allowed to enter more than eight hours per day or enter his actual start and finish times, often 7:00 a.m. and 8:00 p.m., respectively.

22.   Mr. Spelts was never paid overtime for any work performed while he was a Project Manger.

23.   As a Project Manager, Mr. Spelts's salary would be reduced for any unexcused absence, such as an unearned sick day.   Even partial day absences – such as two hours for a doctor's appointment – were taken out of Plaintiff's salary at the hourly rate.

24.   Although Mr. Spelts was called a "manager," he soon learned that the title meant very little.   Rather than managing the work, Mr. Spelts was again doing the work.

25.   Mr. Spelts was told he would be responsible for capital expenditures and maintenance on sixteen properties in the Phoenix area owned by Acacia Capital and managed by AMC.   Mr. Spelts was told he would be responsible for taking bids, coordinating work budgets for capital improvements and working with outside vendors.

26.   Mr. Spelts never supervised anyone.  Mr. Spelts and the maintenance supervisors were informed by Jaren Bradley in a meeting that Mr. Spelts did not supervise them.

27.   As a Project Manager, Mr. Spelts did not have hiring or firing authority over any employee.

28.   In reality, Mr. Spelts did very little bidding and budgeting work, and the work he did do was dictated by AMC.  Mr. Spelts was never authorized to approve vendor contracts for maintenance or for capital improvements.

29.   As a Project Manager, Mr. Spelts regularly performed maintenance work orders at the properties when they would fall behind.  Mr. Bradley would instruct him to go to a property and not leave until the site was caught up on work orders.

30.   As a Project Manager, Mr. Spelts spent most of his working time welding pool fences, installing ceiling fans, installing doors, installing light fixtures, changing faucets, replacing bathtubs, fixing heating and air conditioning, and doing whatever else was necessary to keep the apartment complexes in working order.

31.   In one example Mr. Spelts personally renovated two apartment units.  He spent 12 days personally renovating units 1039 and 1096 of 2150 Arizona Avenue South, an Acacia Capital property.   He was told to do the work after Mr. Bradley was unhappy with the work of an outside contractor that required five employees and four weeks to do the same amount of work.  Mr. Spelts worked from 6:00 a.m. to 11:00 p.m. most of those twelve days and met the deadline.

32.   Mr. Spelts's work during his time was directed primarily by Mr. Jaren Bradley, Senior Vice President of Operations, Ms. Jenny O'Leary, Vice President of Operations, and by Ms. Janet Bray, Executive Vice President of Acacia Capital Management.  He was told daily where to work, what work to perform, and how to prioritize his workload.

33.   Mr. Spelts was not permitted to exercise discretion and independent judgment.  He did not formulate, affect, interpret, or implement management policies or operating

practices, he did not carry out major assignments, he did not perform work that affects

business operations to a substantial degree, he did not have the authority to bind AMC on

significant matters, he was not involved in planning for business objectives, and he did

not provide expert advice to management.

34.    Although Mr. Spelts knew he was employed by AMC, he was told by AMC that he

was to follow orders from Ms. Janet Bray, Acacia Capital's person in charge of the

sixteen properties where Mr. Spelts.

35.    Ms. Janet Bray did direct Mr. Spelts's work.  Ms. Bray was in Phoenix and on-site

directing Mr. Spelts approximately one week per month.

36.    AMC and Ms. Bray's relationship was so close that Ms. Bray arranged to lease a

home she owned to Mr. Spelts.  Rather than paying rent to Ms. Bray directly, Ms. Bray

arranged for AMC to deduct the rent payment from Mr. Spelts' paycheck and somehow

credit or pay her.

37.    Mr. Spelts leased the home until finally buying it from Ms. Bray in 2015.

38.    In addition to paying Ms. Bray by payroll deduction, Ms. Bray also required that

Mr. Spelts care for her Arizona home as a part of his Project Manager duties.  This

required him to clean and maintain her pool, take packages inside and inspect the

property for problems.

39.    Mr. Jaren Bradley also required that Spelts perform home maintenance as a part of

his salaried duties.  For example, Mr. Spelts fixed Mr. Bradley's pool, put screens on Mr.

Bradley's house, fixed his refrigerator and supervised renovations of another property

Mr. Bradley owned.

40.   Mr. Greg B. Wiseman, President of AMC, paid Mr. Spelts a $200 allowance to look after Mr. Wiseman's Arizona home.  Mr. Wiseman's mother would give Mr. Spelts the money.

### MR. SPELTS SUFFERS HIS FIRST HEART ATTACK

41.   On or about December 22, 2014, Mr. Spelts suffered a heart attack.

42.   Mr. Spelts was out of work from December 22, 2014 to March 9, 2015, when he returned to work.

43.   When Mr. Spelts returned, he returned with restrictions to his work that he was unable to lift heavy objects or stand for more than one hour.  AMC understood these restrictions and agreed to that he could do the job of Project Manager with those restrictions.  Jaren Bradley assured him of this.

44.   Despite Mr. Bradley's assurance on March 9, within one month AMC was quickly back to its old ways.  Within a month Mr. Spelts was working on work orders on properties that were behind and the same tasks he was assured he would not be asked to perform.

45.   After his heart attack, Mr. Spelts was able to stop the extra work on Ms. Bray and Mr. Wiseman's homes.

### MR. SPELTS SUFFERS HIS SECOND HEART ATTACK

46.   On or about November 19, 2015, Mr. Spelts suffered his second heart attack.  He was also diagnosed with diabetes mellitus.

47.   Mr. Spelts, fearful that AMC would fire him, returned to work after only two weeks to recover.

48.    Upon returning to work, Mr. Spelts told AMC that his doctor had  again imposed the same restrictions the amount of physical labor he could perform on the job.

49.    AMC agreed that it could accommodate the restrictions so that Mr. Spelts could keep his job.

50.    Mr. Spelts returned to work with restrictions as a Project Manager  for about two months --until mid-February.

## AMC FIRES MR. SPELTS BY CLAIMING TO "DISSOLVE" HIS POSITION COMPANY-WIDE

51.    On or about February 14, 2016, Bradley and O'Leary told Mr. Spelts AMC had "dissolved" the position of Project Manager "company-wide."  His only option, the explained, was to be demoted him to Maintenance Supervisor.

52.    Despite AMC's claim to "dissolve" the position of Project Manager, Mr. Spelts is informed and believes and thereon alleges that there were no other Project Manager's employed by AMC in Arizona and may not be anywhere.   Mr. Spelts is informed and believes and thereon alleges that there was one other employee with a different title doing similar work and that that employee's position was not eliminated.

53.    Bradley and O'Leary knew from past discussions that Mr. Spelts could not physically do the maintenance and handyman work required for the position after two heart attacks.  Mr. Spelts told them this again..

54.    Bradley and O'Leary responded that the there was no longer a job for Mr. Spelts.

55.    Mr. Spelts met with his cardiologist, who told him again that he could not perform the physical work required of a maintenance supervisor.  Mr. Spelts never returned to work after February 17, 2016.

56.    Mr. Spelts received his final paycheck on March 17, 2016.  The pay was at the reduced rate for his "new" position, including all of his past accrued vacation pay, which AMC represented to be 75 hours, at the new position rate of $27.00 per hour rather than his Project Manager rate of $32.87 per hour.

57.    Despite telling Mr. Spelts his restrictions prevented him from doing the new job, Mr. Spelts is informed and believes and thereon alleges that AMC later told his disability insurer that Mr. Spelts's restrictions did not prevent him from doing the job.  Mr. Spelts is informed and believes and thereon alleges that AMC provided Mr. Spelts's disability insurer with a scope of work description that is inconsistent with the duties that were actually required of Mr. Spelts..

58.    As a result of AMC's termination of Mr. Spelts, he has suffered anxiety, depression and stress, all of which have contributed to worsening his heart condition and overall health.

## DEMAND FOR JURY TRIAL

59.    Plaintiff demands a jury trial on all counts.

## COUNT I

### Failure to Pay Overtime Wages in Violation of the FLSA

60.    Plaintiff incorporates by reference all previous allegations as though set forth fully herein.

61.   During the three-year period prior to the filing of this action Defendant was Mr. Spelts's "employer" as defined in 29 U.S.C. § 203(d).

62.   During the three-year period prior to filing this action Mr. Spelts was a covered "employee" as defined in 29 U.S.C. § 203(e)(4).

63.   During the three-year period prior to filing this action, Defendant required Plaintiffs to work in excess of 40 hours per week without paying overtime compensation as required by the FLSA.

64.   At all material times, Mr. Spelts was  improperly classified as "exempt" from the FLSA overtime compensation requirements.  In fact, Mr. Spelts's job duties did not cause him to be exempt.

65.   At all material times, Mr. Spelts worked at least 50 hours per week and was not paid overtime.

66.   Mr. Spelts has suffered economic damages as a result of Defendants unlawful conduct.  Mr. Spelts is entitled statutory remedies including payment for uncompensated hours worked, liquidated damages, prejudgment interest and attorneys' fees and costs.

67.   As a direct result, Plaintiff suffered mental and physical harm, shame, embarrassment and lost compensation.

68.   Defendant's conduct described above was aggravated, outrageous and guided by an evil mind; accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

1

2

**COUNT II**

3

**Failure to Keep Records in Violation of the FLSA**

4

69.   Plaintiff incorporates by reference all previous allegations as though set forth fully

5

herein.

6

70.   During the three-year period prior to the filing of this action Defendant was Mr.

7

Spelts's "employer" as defined in 29 U.S.C. § 203(d).

8

9

71.   During the three-year period prior to filing this action Mr. Spelts was a covered

10

"employee" as defined in 29 U.S.C. § 203(e)(4).

11

72.   At all material times, Mr. Spelts was improperly classified as "exempt" from the

12

13

FLSA overtime compensation requirements.  In fact, Mr. Spelts's job duties did not cause

14

him to be exempt.

15

73.   At all material times, Defendant did not keep accurate records of the hours Mr.

16

17

Spelts worked.  In fact, Defendant required Mr. Spelts to record only forty hours per

18

week.  Defendant directed Mr. Spelts how to allocate the forty hours among the sixteen

19

Acacia properties he maintained. These records do not accurately reflect the total hours

20

worked or the actual allocation of time among the sixteen Acacia properties.

21

22

74.   Defendant's conduct described above was aggravated, outrageous and guided by an

23

evil mind; accordingly, Plaintiff is entitled to an award of punitive damages against

24

Defendants.

25

26

27

28

## COUNT III

### Failure to Pay the Minimum Wage in Violation of the Arizona Minimum Wage Act

75.  Defendants were required to pay Mr. Spelts the Arizona minimum wage pursuant to A.R.S. § 23-363, but willingly failed to do so.

76.  Defendants were aware or should have been aware of their obligation to pay Mr. Spelts the Arizona minimum wage.

77.  Mr. Spelts is informed and believes and therefore alleges that Defendants failed to maintain payroll records showing the hours Mr. Spelts worked each day, in violation of A.R.S. § 23-364(D).  Accordingly, there is a rebuttable presumption that Defendants did not pay the required minimum wage, and Defendants are subject to the civil penalties set forth in A.R.S. § 23-364(F).

## COUNT IV

### Failure to Timely Pay Wages in Violation of Arizona Wage Statutes

78.  Defendants failed to pay wages owed to Mr. Spelts in a timely manner.

79.  Defendants failed to pay past vacation wages due to Mr. Spelts in a timely manner.

80.  As a direct result, Plaintiff suffered financial damages as well as mental and physical harm, shame and embarrassment.

81.  Defendant's conduct described above was aggravated, outrageous and guided by an evil mind; accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

1

2

**COUNT V**

3

**Interference in violation of the FMLA**

4

82.    Plaintiff incorporates by reference all previous allegations as though set forth fully

5

herein.

6

83.    Defendant is an "employer" under the FMLA.  Defendant has continuously

7

employed fifty or more employees for the required time period.

8

9

84.    Plaintiff was at all relevant times an "eligible employee" of Defendant as defined in

10

the FMLA.

11

85.    Plaintiff lawfully exercised his right to FMLA leave upon learning of his illness.

12

13

86.    Defendant interfered with that right by denying him the same or similar terms and

14

conditions of employment upon his return from FMLA leave.  Specifically, Defendant

15

agreed to accommodate Mr. Spelts's work restrictions but then dissolved his position

16

17

shortly thereafter.  Mr. Spelts suffered this adverse employment action as a result of

18

Defendant's interference with his right to return to the same or similar terms and

19

conditions of employment.

20

87.    As a direct result, Plaintiff suffered mental and physical harm, anxiety, depression

21

22

and lost compensation.

23

88.    Defendant's conduct described above was aggravated, outrageous and guided by an

24

evil mind; accordingly, Plaintiff is entitled to an award of punitive damages against

25

26

Defendants.

27

28

## COUNT VI

### Retaliation in violation of the FMLA

89.   Plaintiff incorporates by reference all previous allegations as though set forth fully herein.

90.   Plaintiff lawfully exercised his right to FMLA leave upon learning of her illness.

91.   Upon returning to work, however, Plaintiff was not restored to the same or equivalent conditions of employment.  Instead, Plaintiff's position was eliminated and Plaintiff was told he could not perform the new position with his doctor's restrictions.

92.   Plaintiff's exercise of his rights under the FMLA and taking FMLA leave was a motivating factor behind these adverse actions taken by Defendant toward Plaintiff.

93.   As a direct result, Plaintiff suffered mental and physical harm, anxiety, depression and lost compensation.

94.   Defendant's conduct described above was aggravated, outrageous and guided by an evil mind; accordingly, Plaintiff is entitled to an award of punitive damages against Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A.   For an award of economic damages in an amount sufficient to make Plaintiff whole for past and future lost income and benefits and other economic losses suffered by Plaintiff resulting from Defendants' conduct;

B.   For an award of compensatory damages for mental anguish, emotional distress, pain and suffering, humiliation, anxiety, depression, inconvenience, harm to

1    reputation, loss of enjoyment of life and other losses incurred by Plaintiff as a

2    result of Defendants' conduct.

3    C.    For an award of liquidated damages, statutory damages and fines;

4

5    D.    For an award of punitive damages;

6    E.    For an award of attorneys' fees and related expenses;

7    F.    For an award of prejudgment and post-judgment interest;

8

9    G.    For an award of Plaintiff's costs of suit; and

10   H.    For such other relief as the Court may deem just and proper.

11

12

13                                        Dated this 26th day of April, 2016,

14

15

16                                        /s/Nathan M. Smith_____

17

18                                        Nathan M. Smith
                                          Attorney for Plaintiff

19

20

21

22

23

24

25

26

27

28

Complaint and Demand for Jury Trial - 17